# JOHNSTON ET AL. v. ROTHWELL ET AL.

(Nos. 2045, 2046; February 14, 1939; 87 Pac. (2d) 13)

100

For the plaintiffs, Katharine T. Johnston and Albert D. Johnston (appellants in No. 2045, respondents in No. 2046) there was a brief by *Wilfred O'Leary* of Cheyenne, Wyoming, and *Fred R. Wright* of Denver, Colorado, and oral argument by *Mr. Jackson Seawell* of Denver.

For defendants, Isaac B. Smith and W. T. Alden,. (respondents in No. 2045, appellants in No. 2046) there was a brief by *Alden, Latham & Young,* of Chicago, Illinois, and *Burton S. Hill,* of Buffalo, Wyoming, and oral argument by *Mr. W. T. Alden.*

For the other defendants and respondents, there was a brief by *E. E. Enterline* of Casper, and *Burt Griggs* of Buffalo, and oral argument by *Mr. Griggs*.

KIMBALL, Justice.

The appeals are from a judgment following an accounting under a contract providing for payment of certain debts of the Northwest Power Company, a holding corporation, hereinafter usually called "the Power Company."

The Power Company, in 1929, owned the capital stock of several subsidiary public utility corporations. The capital stock of the Power Company, 10,000 shares was owned by parties who for the purpose of the case are divided into three groups: the Rothwells (H. P. Rothwell and his sons, Paul A. and Erwin C.) who owned 6,050 shares; Smith & Alden (Isaac B. Smith

and W. T. Alden, and their associates) who owned 2,500 shares, and the Johnstons (A. D. Johnston and Katharine T. Johnston) who owned 1,450 shares.

In April, 1929, one of the Rothwells agreed in writing to cause the Power Company to sell to H. M. Byllesby and Company, hereinafter called "the Byllesby Company," the capital stock of the subsidiary companies for $1,245,000. At that time two of the subsidiary companies were defendants in what is called the Clarke suit, an action by Clarke and others, as plaintiffs, then pending in the United States District Court. By Section 4 of the contract for sale of the stock it was provided that the Byllesby Company should retain $100,000 of the purchase price "as indemnity for the payment of any judgment or judgments rendered against the defendants" in the Clarke suit, and any other judgments for causes arising before the transfer of the stock. The Byllesby Company agreed to pay the Power Company 6 per cent. interest on the sum so retained. By section 6 of the contract the Power Company agreed to indemnify and hold harmless the Byllesby Company and the subsidiary companies "against any claims, judgment or damages" arising before the transfer of the stock. Section 7 provided that the Power Company should "retain sixty-five per cent. of its assets, or securities, or cash, amounting to the same as the funds with which to further indemnify [the Byllesby Company] and the subsidiary companies against loss or damage referred to in Sections 4 and 6." The contract was ratified and adopted by the Power Company, and by July 1, 1929, the stock of the subsidiary companies had been transferred to the Byllesby Company, and the purchase price, except the mentioned $100,000 paid to the Power Company or to holders of its bonds.

The effect of this transaction was to convert practically all of the assets of the Power Company into

cash, about $425,000. Later, during the latter part of 1929, about $200,000 was invested in the stocks of various public utility and industrial companies and in promissory notes of individuals and companies. This was the financial condition of the Power Company on December 31, 1929, as shown in detail by the report of Gregerson Brothers, certified public accountants, employed to examine the books and records of the company. The report, called the "Gregerson audit," was accepted by the stockholders of the Power Company as the basis of the negotiations that led to the contract now to be mentioned. In January of 1930 the Johnstons and Smith & Alden who (it is said in the brief) were alarmed at the prospects of loss on the stocks of other companies in which funds of the Power Company had been invested, offered to sell their shares of stock in the Power Company to the Rothwells. The offer was accepted and the contract put in a writing, dated January 15, 1930, in which the Power Company is called the first party; the Rothwells second parties; Smith & Alden third parties and the Johnstons fourth parties. The material parts of this contract are contained in the following summary.

The contract is prefaced by a reference to the Byllesby contract and particularly to the provisions of sections 4, 6 and 7 thereof. The second parties agreed to purchase from the third and fourth parties all their stock in the first party for $40 per share, "plus any salvage" from the fund of $100,000 retained by the Byllesby Company. Provision was made for setting up two funds called, respectively, the "indemnity fund" and the "revolving fund." The third and fourth parties agreed to deposit with the first party $10 per share, total $39,500, of the purchase money to be held by first party "as a part of the indemnity fund required by that paragraph [7] of said Byllesby contract which relates to the retention of the assets of the first party

as above mentioned." The first party agreed to deposit this $39,500, "less the revolving fund hereinafter mentioned," on savings deposit in the First National Bank of Buffalo, Wyo. So long as this indemnity fund or any portion thereof should remain in the possession of the first party, the third and fourth parties were to be "entitled to receive the interest and income therefrom." It was also provided that "a revolving fund of $10,000 shall be established for the purpose of meeting expenses and costs of litigation arising out of the acquisition of the Hot Springs Light & Power Company [the Clarke suit]," of which amount the second, third and fourth parties agreed to contribute $6,050, $2,500, and $1,450, respectively, "provided, that the contributions from the third and fourth parties respectively may be taken out of and deducted from their respective contributions to the indemnity fund aforesaid." It was agreed that the $10,000 revolving fund should be deposited in the First National Bank of Buffalo, Wyo., subject to the check of H. P. Rothwell, and that "all checks shall be accompanied by vouchers showing the payment of the items for which said checks are drawn." It was understood "that the said H. P. Rothwell shall be entitled to pay, out of said revolving fund, any of the expenses arising out of the litigation [known as the Clarke suit], and any income tax assessed against the Northwest Power Company for years prior to 1930." It was further provided that "immediately upon the payment of any item, the said H. P. Rothwell shall notify the third and fourth parties respectively of the expenses so paid and they shall immediately reimburse said revolving fund for their pro rata proportion of such expense, it being the intention of the parties hereto that said revolving fund shall not decrease below the sum of $10,000 except temporarily." The second parties agreed to contribute in like manner their proportion of any deficiency in said fund. If third

and fourth parties should fail, after notice, to reimburse the revolving fund, H. P. Rothwell was authorized to take the money out of the indemnity fund. It was further provided that "any and all interest received from the $100,000 deposit with Byllesby & Company shall be placed in the revolving fund." There were provisions for distribution of anything remaining in the mentioned funds after the claims payable therefrom had been satisfied.

Pursuant to the above contract Smith & Alden and the Johnstons were paid the purchase price for their stock, $30 per share in cash, and $10 per share, $39,500, deposited in the mentioned bank, $35,550 as the indemnity fund, and $3,950 as their part of the revolving fund. The Rothwells deposited their part, $6,050, of the revolving fund.

Neither the books of the Power Company nor the Gregerson audit disclosed any liability for Federal income taxes for the years prior to 1930, but in 1931 the United States assessed against the Power Company for the year 1929 an income tax amounting to $46,668. H. P. Rothwell employed income tax consultants and attorneys to resist the tax, and the matter was pending before the Board of Tax Appeals when this action was begun.

The action was begun by the Johnstons as plaintiffs, by filing a petition in which the Rothwells, the Power Company and the First National Bank of Buffalo, Wyoming, were named originally as defendants. The petition purports to state four causes of action. The first cause of action gives a history of the transactions to which reference is made above, and alleged that by the contract of January 15, 1930, H. P. Rothwell became a trustee for the purpose of disbursing the money in the revolving fund in accordance with the terms of the contract, and that he had breached the contract by paying out moneys for unauthorized purposes, by fail-

ing to procure vouchers and by failing to notify the Johnstons and Smith & Alden of payments. The second cause of action alleged a breach of the contract by the Rothwells in failing to keep intact 65 per cent of the assets of the Power Company. It sets forth also the assessment of the income tax, and alleges that there is danger that the United States will attempt to enforce the entire amount of the assessment against the indemnity fund. The third cause of action related to the cancellation on the books of the Power Company of an account against Smith & Alden. This, it was alleged, constituted a secret overpayment to Smith & Alden in which plaintiffs were entitled to share. The fourth cause of action alleged that the Rothwells had secretly changed the books of the Power Company in order to shift the burden of the income tax from themselves to the company.

The prayer of the petition was for an accounting by H. P. Rothwell, as trustee of the revolving fund; that the Rothwells be required to restore to the treasury of the Power Company assets improperly taken therefrom as alleged in the second cause of action; that plaintiff be given credit for their proportion of the overpayment alleged in the third cause of action, and that the Rothwells and the Power Company be compelled to correct the valuation of the properties of the Power Company on the books of the company.

The answer of the Rothwells and the Power Company admitted the contract of January 15, 1930, and the transactions preceding the contract, and denied all allegations of breach of contract or misconduct.

On motion, Smith & Alden and the Byllesby Company were made parties defendant. The answer of Smith & Alden agreed with plaintiffs' petition, and asked similar relief, except on the third cause of action which they denied.

The Byllesby Company was brought into the case

because of the interest the other parties have in what remains of the $100,000 fund after the judgment in the Clarke suit was satisfied. The court found that the amount remaining was $4,100. The Byllesby Company has not appealed, and this finding is not questioned.

The United States Collector of Internal Revenue for the District of Wyoming was also made a party defendant, but was discharged on his special appearance questioning the court's jurisdiction.

In the meantime, and on January 14, 1935, the controversy between the United States and the Power Company had been settled by agreement whereby an income tax for the year 1929 amounting to $32,376 and interest was assessed against the Power Company, and in March, 1935, the United States Collector of Internal Revenue served on the First National Bank of Buffalo a notice of tax lien and warrant for distraint for the purpose of impounding deposits of the Power Company including the indemnity fund above mentioned. Notices were also served on the Byllesby Company for the purpose of impounding moneys owed by it to the Power Company.

Later, in October, 1935, the plaintiffs filed a supplemental petition asking the appointment of a receiver for the Power Company.

The issues, including the accounting by H. P. Rothwell as custodian of the funds deposited pursuant to the contract of January 15, 1930, and by the Byllesby Company as custodian of the $100,000 fund, were tried by the court without the assistance of referee or master commissioner.

The judgment appealed from found generally against the plaintiffs on the second, third and fourth causes of action. On the accounting of H. P. Rothwell as trustee under the contract of January 15, 1930, it was found that Rothwell had received $39,500 deposited on the making of the contract, and $21,500 interest on the

$100,000 held by the Byllesby Company; that he had paid, pursuant to the contract, expenses amounting to $21,244.84, and that there were unpaid bills for such expenses, amounting to $5,769.87. The bills included expenses of contesting the income tax assessment, but not the tax itself. It was found that the Johnstons and Smith & Alden should be charged with and pay $2,279.09 (39.5 per cent. of the unpaid bills) "which said last named sum should be paid out of and deducted from the balance due [them]" and "paid only upon the further order of this court as hereinafter provided." It was further found that the balance, $3,490.78 (60.5 per cent.), of the unpaid bills should be paid by H. P. Rothwell. It was found that the indemnity fund and accrued interest, on deposit in the First National Bank of Buffalo, belonged to the Johnstons and the Smith & Alden in proportions corresponding to the amounts of their deposits, and that the $4,100 due from the Byllesby Company, should be deposited in court, and owned by the Power Company, 60.5 per cent; Smith & Alden 25 per cent. and the Johnstons 14.5 per cent. As the result of the accounting the Johnstons were given judgment for $1,486.93, and Smith & Alden for $2,563.96, against H. P. Rothwell. It was ordered that the indemnity fund and interest on deposit in the First National Bank of Buffalo be transferred on the books of the bank to the credit of the Johnstons and Smith & Alden in the proper proportions, that the $4,100 to be paid into court by the Byllesby Company should be owned in accordance with the findings, and that said sums so deposited should be held and retained until the claim of the United States Collector of Internal Revenue should be settled, adjusted or adjudicated, and until the further order of the court. It was further ordered that the court retain jurisdiction of all parties to the action and of the subject matter in controversy

for such final disposition thereof as justice might require.

The Johnstons and Smith & Alden prosecute separate appeals, which may be discussed in one opinion. The judgment on the first, second and fourth causes of action is challenged on similar grounds by appellants in both appeals. As to the judgment on the third cause of action, Smith & Alden allign themselves with other respondents.

The parties agree that H. P. Rothwell, in holding and paying out moneys under the contract of January 15, 1930, was acting as a trustee, and we need not inquire whether the relation between the parties might in some respects be distinguished from a trust.

It seems that none of the parties to the contract of January 15, 1930, has been willing to perform all the obligations assumed with respect to the administration of the funds then made available for payment of debts of the Power Company. H. P. Rothwell, as trustee of the funds, made payments, some of which were unauthorized, by checks not accompanied by vouchers, and without giving prompt notice to appellants. On the other hand, the appellants, since the assessment of the income tax against the Power Company, have apparently been overzealous in searching for a construction of the contract or some act of the Rothwells that will release them from their promises.

We cannot agree with appellants in their contention that irregularities by H. P. Rothwell in handling the funds was a breach that had the effect of releasing appellants from their agreement that the funds established by the contract should be used in paying debts mentioned therein. On the accounting the trustee was surcharged with the unauthorized payments, some twenty items. The trustee's duty in paying claims to follow the procedure set forth in the contract arose from a promise as distinguished from a condition. See

Williston on Contracts, § 665. We do not understand that appellants deny that the trustee made the payments for which he was allowed credit. Canceled checks showing the fact of payment were produced at the trial. There were also vouchers and oral testimony by the trustee showing the nature of the services paid for. Some of the vouchers were prepared by the trustee himself and were perhaps for that reason objectionable. However, it is apparent that there was no serious dispute as to the nature of the services paid for, and the only real question in issue was whether the expenses were properly payable from the funds under the trustee's control. If they were, the appellants were not injured by the absence of proper vouchers or by the trustee's failure promptly to report payments as made by him.

The trustee was allowed credit on the accounting for attorneys' fees and other expenses in contesting the income tax assessment. The appellants assign this as error. They concede that as a general rule a trustee is entitled to be reimbursed for expenses incurred in protecting the fund in his hands, but say that in this case the agreement of the parties must control, and rely, without any citation of authorities, on the fact that the contract provides for payment of the income tax without mention of expenses in connection therewith. We do not know what appellants would have said if the trustee had not contested the assessment. The contest resulted in a reduction of some $13,000. The court was justified in finding that the expenses were incurred in good faith. In appellants' brief it is said that they do not mean to say that the trustee "did not do his best to get the tax reduced," and the expenditures in that regard are not attacked on the ground that the amounts were unreasonable. The trustee has an inherent equitable right to reimbursement for reasonable and proper expenses, and it is immaterial that

there is no provision therefor in the instrument creating the trust. See texts on trusts. Lewin (13th ed.) p. 461; Perry (7th ed.) § 910; Bogert, § 923. The trustee may even be allowed credit for expenses not properly incurred if the trust estate has been benefited thereby. Bogert, *supra,* p. 2832; Restatement of Trusts, § 245. We hold that the court properly gave the trustees credit for these expenses.

Other payments for which the trustee was given credit on the accounting were for attorneys' fees and other expenses incurred in the Clarke suit. Some of these payments were for services rendered before the date of the contract, January 15, 1930. Appellants say that the trustee was authorized to pay for those services only that were performed after that date. They rely on the words "arising out of," as contained in the contract, and cite cases holding that the word "arising," as used in certain statutes, refers to future transactions. United States v. Heth, 3 Cranch, 399, 413; Young v. United States, 176 Fed. 612, 615. On the other hand, in Moore v. Hope Natural Gas Co., 76 W. Va. 649, 652, 86 S. E. 564, in construing a release of damages, it was said that " 'arising,' while having a progressive and prospective meaning in some circumstances, usually signifies the present," and held that damages "arising from" the laying and operating of a pipe line did not necessarily comprehend future damages. The words "arising out of" may be used in the sense of "growing out of, created by or brought into being by." See Bank of U. S. v. Roberts, Fed. Cas. No. 934; 4 Conn. 323; Century Dictionary, "Arise." In the standard dictionaries "originate" is given as a synonym of "arise." The parties in referring to expenses "arising out of" the Clarke suit were speaking of the origin or cause of the expenses, and, we think, did not use the present participle "arising." with the intention of excluding payments for services theretofore ren-

dered. Considering the purpose of the contract, there was no reason for distinguishing expenses for past services from those for future services. The Rothwells, by buying appellants' stock, were becoming the owners of all the capital of the corporation. The parties evidently tried to value the stock at an amount equal to the value of the net assets of the company. They agreed, on the basis of the Gregerson audit, that the stock was worth $40 per share, but it was realized that there were some assets and liabilities so uncertain that they could not enter into this calculation. These were the assets and liabilities referred to in the contract of January 15, 1930, and the main purpose of the contract was to provide in effect that the amount, $40 per share, then paid to the selling stockholders, should be increased by receipt of assets and decreased by payment of liabilities that were too indefinite to be considered in valuing the net assets of the company at the time of the contract. The assets were the interest on, and possible salvage from, the $100,000 held by the Byllesby Company. The liabilities were (1) expenses and costs "arising out of" the Clarke suit; (2) "any income tax assessed against the Northwest Power Company for years prior to 1930"; and (3) a possible liability to the Byllesby Company in excess of the $100,000 retained by it under the contract of April, 1929.

The Clarke suit had been in court for some time, and many bills for expenses had already been paid, as shown by the Gregerson audit. None of the unpaid expenses were shown in the audit, and while the parties must have known that there were some expenses for services already earned that had not been paid, these, like other expenses of the litigation, were uncertain in amount and not capable of entering into the estimate of the net assets of the company, and, therefore, were left for settlement under the contract of January 15, 1930. The writing itself shows that the parties used

the words "arising out of" in the sense we give them. It is only in one place that the writing speaks of expenses "arising out of" the Clarke suit. The expenses are first referred to as expenses and costs of "litigation arising out of the acquisition of the Hot Springs Light & Power Company." Here the words "arising out of" refer to litigation which had arisen long before the date of the contract. In another clause, not otherwise material, the parties refer to past contracts as "arising out of" their ownership of the Power Company, and release each other from past and present liabilities "arising out of" transactions theretofore pending between them.

The interest promised by the Byllesby Company on the $100,000 retained by it was payable semi-annually. The first installment, $3,000, was listed in the Gregerson audit of December 31, 1929, among the "accounts receivable," and was paid about January 1, 1930. The trustee was charged with interest received from the Byllesby Company amounting to $21,500, which did not include the first payment of $3,000. The only reason for not including the first payment is that it was in the hands of the Power Company when the contract of January 15, 1930, was made, and that the parties did not intend that interest previously received should be subject to the contract. However, the contract provision on this subject is too clear to require interpretation. It says that "any and all interest received from the $100,000 deposit with Byllesby & Company shall be placed in the revolving fund." We think this language, as understood by the parties, referred to all interest whether received before or after the date of the contract, and that, as in the case of expenses, had the parties intended to distinguish past from future transactions, their contract would have been worded differently.

The judgment order contains findings showing that

the trustee received for the revolving fund $31,500 ($10,000 originally deposited and $21,500 interest paid by the Byllesby Company) of which 60.5 per cent was contributed by the Rothwells and 39.5 per cent by appellants. The bills paid ($21,244.84) and unpaid ($5,769.87), chargeable against the fund, amounted to $27,014.71, leaving a balance of $4,485.29, of which appellants were entitled to 39.5 per cent., or $1,771.69. The judgment, after finding the amount of the unpaid bills $5,769.87, recites that appellants should be charged with 39.5 per cent. thereof ($2,279.09), "which said last named sum should be paid out of and deducted from the balance due [appellants]" and "paid only upon the further order of this Court as hereinafter provided."

Appellants argue that the above provisions are inconsistent because, after findings showing that there should be in the revolving fund $1,771.69 belonging to them after all bills are paid, they are required to pay $2,279.09 on the unpaid bills. The argument fails to take into consideration all the provisions of the judgment. Appellants are charged with their proportion of the unpaid bills, but it is recited that payment shall be made out of and deducted from the balance due them. This balance due them is $4,050.88, fixed by the judgment for that amount in their favor. When $2,279.09 is deducted from the amount of the judgment, the remainder is almost exactly $1,771.69, the amount which the trustee should return to them.

It is contended that the judgment is inadequate in failing to provide that the indemnity fund on deposit in the First National Bank of Buffalo and 39.5 of the $4,100 turned into court by the Byllesby Company, be at once turned over to appellants. These funds, having been attached by the United States, the trial court, correctly we think, held that at this time it could go no further than to declare the ownership of the funds,

leaving the question of enforcement of the attachment liens to the Federal Courts. The judgment provides that jurisdiction of the present action is retained "for such final disposition thereof as justice may require," and no doubt the court will have power to adjust any future controversies that may arise between the parties to this action as the result of the disposition of the funds under attachment.

We speak next of the second cause of action. There was evidence tending to show that after January 15, 1930, the Rothwells had taken assets from the treasury of the Power Company, and had substituted therefor their own notes and notes of other companies which appellants assert had little or no value. It is contended that this evidence required a finding that the Rothwells and the Power Company had failed to retain 65 per cent of the Power Company's assets, as provided by section 7 of the Byllesby contract. It is argued that this was a material breach of the contract of January 15, 1930, and that it resulted in releasing appellants from their obligations under the contract. The same facts are relied on as a ground for the appointment of a receiver with power to collect and properly to apply the assets of the Power Company. The Power Company, in the contract of April, 1929, had promised the Byllesby Company that 65 per cent of the Power Company's assets should be retained. The promise was not made to appellants. It was made to the Byllesby Company to protect it in case the $100,000 fund held by it was insufficient to pay judgments, claims etc. referred to in sections 4, 6 and 7 of the contract of April, 1929. The recitals of the contract of January 15, 1930, refer to that promise to show that the $39,500 indemnity fund was a part of the retained assets to which the Byllesby Company might resort. The $100,000 fund proved to be sufficient to satisfy the judgment in the Clarke suit, and before the issues in this action were

framed it had become apparent that there were no other judgments or claims that needed to be satisfied for the protection of the Byllesby Company. There was no longer any obligation on the part of the Power Company to retain its assets, and, no doubt, the indemnity fund established under the contract of January 15, 1930 would have been returned to appellants in this action except for the income tax proceedings.

From the evidence relating to the third cause of action the trial court was justified in finding the facts substantially as follows: During the negotiations preliminary to the contract of January 15, 1930, Smith & Alden for the first time discovered that the books of the Power Company showed they were charged with $6,626.62 which they did not owe. They demanded a release which was given, signed by the Power Company. On these facts there was no question of a secret overpayment to Smith & Alden, but merely the release of a disputed account which, if it had been paid, would not have benefited the Johnstons who were parting with their interest in the company.

The evidence on the issue presented by the fourth cause of action was substantially this. One of the subsidiary companies whose stock was sold to the Byllesby Company in 1929 was the Thermopolis Gas Company. About 1500 shares of the stock of the Gas Company was obtained by the Power Company in 1926 from the Rothwells in exchange for stock of the Power Company of the par value of $213,500. On September 30, 1926, a firm of accountants (not the Gregersons) made a report of audit listing in the assets of the Power Company 1563 shares of the stock of the Thermopolis Gas Company, valued at $213,500. Mr. Johnston and the Rothwells were interested in the Power Company from the beginning, and when the report of the audit of September 30, 1926, was submitted Smith & Alden were about to become interested. Mr. H. P. Rothwell

testified that Mr. Johnston, then Secretary of the Power Company, and Mr. Alden, were not satisfied with the report of audit, and that (probably in November, 1926) Mr. Johnston had the Gregersons make another audit which was followed in the "capital set-up" entered by H. P. Rothwell on the books of the company. In the "set-up" the stock of the Gas Company was listed among the assets as "1361 [sic] shares Thermopolis Gas Co. stock par $136,100," and the stock was not valued separately, but lumped with several other items that were given the total valuation of $43,500. There was testimony that in this valuation stock of the Gas Company was put in at cost: $7,000 for shares obtained from the Rothwells and $10,000 for shares obtained from other persons. There was also evidence that the Gas Company shares turned over to the Power Company by the Rothwells had cost the Rothwells $7,000.

Mr. Johnston testified that this change in valuation of the Gas Company stock was made without his knowledge, but Mr. H. P. Rothwell testified that the change was made by Gregerson and that Mr. Johnston assisted in making it. Mr. Johnston admitted that he knew of the change soon after it was made, and there was no evidence that he objected. Mr. Alden testified that the audit of September, 1926 "wasn't very satisfactory," and neither he nor Mr. Smith gave any further evidence on the subject.

The trial court was justified in finding that all the stockholders consented to the valuation of the Gas Company's stocks in accordance with the Gregerson audit of November, 1926. It is not easy to see how the Rothwells could have supposed that the change would benefit them on their income tax assessment for 1926. The books of the Power Company were not kept for the purpose of showing what the Rothwells paid for the Gas Company stock, and the change did not conceal

the fact that the Rothwells received stock of the Power Company of the par value of $213,500. Besides, the appellants have failed to call our attention to any evidence on which to base the contention that the income tax assessed against the Power Company for the year 1929 would have been any less if the change in 1926 in the valuation of the Gas Company's stock had not been made. The only evidence as to the cause of the assessment of the tax tends to show that the tax was not based on values shown in the Power Company's books, but was based on the excess of the amount received from the Byllesby Company over the actual cost of the stocks to the Power Company.

The judgment on the second, third and fourth causes of action is affirmed. The case will be remanded with direction that the findings on the accounting be modified by charging the trustee with interest received from the Byllesby Company in the amount of $24,500 instead of $21,500, and the judgment modified by an appropriate change in the amount which appellants recover from the trustee. As so modified, the judgment on the first cause of action also is affirmed.

Judgment modified and affirmed.

RINER, C. J., and BLUME, J., concur.